## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
## ASHEVILLE DIVISION
## CIVIL CASE NO. 1:13cv4-MR-DSC

| | | |
|---|---|---|
| **CHARLES T. LEE,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **MEMORANDUM OF** |
| | ) | **DECISION AND ORDER** |
| **NORFOLK SOUTHERN** | ) | |
| **RAILWAY COMPANY,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

**THIS MATTER** is before the Court on remand from the Fourth Circuit Court of Appeals. [Doc. 47]. The appellate court vacated this Court's prior Order [Doc. 37] that granted summary judgment in favor of the Defendant, and remanded the matter to this Court for further consideration. [Doc. 47 at 26]. Specifically, this Court is directed to consider Defendant's "claim-splitting defense in the first instance on remand." [Id. at 25]. Further, because this Court initially addressed only one of the grounds asserted by the Defendant in its Motion for Summary Judgment [Doc. 23], the Court will consider whether judgment in favor of the Defendant is appropriate on any other ground it asserted.

## FACTUAL AND PROCEDURAL HISTORY

Plaintiff Charles T. Lee ("Lee") initiated this action on January 8, 2013. [Doc. 1]. Lee alleges that he was subjected to retaliation by Defendant Norfolk Southern Railway Company ("NS"), in violation of the Federal Railroad Safety Act ("FRSA"), 49 U.S.C. § 20109. Lee, who is African-American, worked for NS as a carman conducting safety inspections of railroad cars and locomotives. He asserts he was the unwarranted recipient of a six-month suspension from employment as retaliation for tagging too many railroad cars with "bad order" citations thus requiring their removal from service for repair. [Doc. 1 at 2].

Sixteen months prior to commencing this action, Lee filed a separate suit against NS in this Court, asserting an action for employment discrimination on the basis of race pursuant to 42 U.S.C. § 1981. Lee v. Norfolk S. Ry., No. 1:11cv245-MR-DCK (W.D.N.C. 2012) (the "First Lawsuit"). In the First Lawsuit, Lee asserted that he was suspended from work for six months as a result of abusive racial harassment, intimidation, and threats. [Doc. 24-3 at 8-9]. The Court granted NS's summary judgment motion in the First Lawsuit on December 12, 2012, and dismissed Lee's case. [Doc. 24-5]. Lee did not appeal the Court's dismissal order. Now, he

asserts that the same six-month suspension occurred in retaliation for his reporting safety violations.[1]  [Doc. 1 at 2].

Lee's position as a carman for NS brings with it the responsibility to conduct safety-related functions including the inspection and repair of railroad cars and locomotives.  [Doc. 1 at 2].  When a carman, like Lee, finds a railroad car in need of repair, he is to place a "bad order" tag on the car setting forth any defect which directs the car to the repair shop.  Such cars are then placed in "bad order" status and removed from service.  [Id.].

Lee alleges in this matter that NS management, including management at the Asheville yard where he worked, maintained artificial "bad order" quotas and NS, therefore, did not want carmen like Lee to "bad order" a number of cars above a set threshold.  [Id.].  According to Lee, NS pressured him not to "bad order" cars and further that NS management and employees removed "bad order" citations from cars Lee tagged for repair.  [Id.].  Lee states that NS's pressure not to exceed the "bad order" quota, had he succumbed to it, would have required him to violate federal rail safety law and regulations as well as NS's own safety rules.  [Id.].  Lee alleges he reported the foregoing acts and omissions to NS management and Equal

_____

[1] While Plaintiff alleges racially motived conduct in this matter nearly identical to that which he asserted to be unlawful in the First Lawsuit, compare [Doc. 24-3 at 6] with [Doc. 1 at 2], "Lee no longer pursues these acts as separate adverse actions in this case." [Doc. 31 at 2, n.1].

Employment Opportunity personnel who took no action to stop or to remediate the same. [Id. at 3]. As a result, Plaintiff "claims that NS improperly suspended him for six months in 2011 as retaliation because he persistently placed 'bad order' tags on defective railcars." [Doc. 31 at 2 (footnote omitted)].

On November 14, 2011, Lee filed a complaint with the Department of Labor's ("DOL") Occupational Safety and Health Administration ("OSHA") asserting the 49 U.S.C. § 20109 retaliation violation that forms the basis for this present action. [Doc. 1 at 4]. By letters dated January 19, 2012 [Doc. 51-2 at 2 to 4], and September 7, 2012 [Doc. 51-3 at 2], NS responded to Lee's OSHA complaint asserting that Lee previously had filed a lawsuit alleging the same harm based on other grounds. On September 21, 2012, the OSHA Area Director found that NS had not committed a retaliation violation under the FRSA. [Id.]. Lee objected to the OSHA Area Director's findings and requested a hearing before the DOL's Administrative Law Judge ("ALJ"). [Id.]. Because the Secretary of Labor, by and through his OSHA designee, had not yet issued a final decision within 210 days of Lee filing his OSHA complaint,[2] Lee notified the ALJ of his intent to file this action in this

_____

[2] On January 11, 2013, three days after Lee filed the present action, Lee's OSHA complaint, that forms the basis for this action, was dismissed by the ALJ. [Doc. 7 at 9].

Court under the FRSA "kick-out" provision, 49 U.S.C. § 20109(d)(3). [Id.]. Meanwhile, on December 12, 2012, this Court granted NS's summary judgment motion in the First Lawsuit and dismissed that case. [Doc. 24-5]. Lee initiated the present action in this Court on January 8, 2013. [Doc. 1].

NS responded to Lee's Complaint in this matter by filing its Answer on February 25, 2013. [Doc. 7]. In its Answer, NS asserts as its Fourth Affirmative Defense that "Plaintiff is precluded from asserting or pursuing here one or more claims and/or issues under principles of collateral estoppel, issue preclusion, and/or res judicata as Plaintiff previously unsuccessfully asserted those claims and/or issues and they were determined against him in this Court." [Id. at 2]. Later in 2013, NS filed its Motion for Summary Judgment asserting several grounds. [Doc. 23]. NS's primary contention, as it was in the OSHA proceeding, was that Lee's present action is barred by the FRSA's election of remedies provision[3] since Lee previously sued NS claiming protection under 42 U.S.C. § 1981 for the very same conduct he alleges in this FRSA lawsuit (i.e., the suspension). [Id. at 3]. This Court agreed that the FRSA's election of remedies section barred Lee's present

---

[3] FRSA's election of remedies section provides that "[a]n employee may not seek protection under both this section and another provision of law for the same allegedly unlawful act of the railroad carrier." 49 U.S.C. § 20109(f).

action and granted judgment in favor of NS. [Doc. 37]. Lee appealed the Court's summary judgment order. [Doc. 39].

On appeal, the Fourth Circuit reversed. [Doc. 47]. The appellate court observed that in the First Lawsuit, the "allegedly unlawful act" was the suspension on the basis of race in violation of Section 1981; in the present lawsuit, the "allegedly unlawful act" was the suspension in retaliation for Lee's whistleblowing regarding rail safety violations. [Id. at 13]. Nevertheless, NS argued on appeal that FRSA's election of remedies provision should be read as a "de facto" substitute for the rule against claim-splitting, and thus prohibited Lee from dividing his claim into separate suits based on race discrimination and an OSHA violation. [Id. at 22]. The appellate court disagreed that the election of remedies provision and the rule against claim-splitting were functional equivalents. Having held that a suspension on the basis of race is not "the same allegedly unlawful act" as a suspension in retaliation for FRSA whistleblowing under the FRSA's election of remedies provision, the appellate court vacated this Court's judgment [Id. at 3] and directed this Court to address, on remand, NS's claim-splitting defense in the first instance. [Id. at 25].

On remand, the Court requested the parties file supplemental briefs. [Doc. 49]. The parties have done so [Docs. 50 & 51], and the matter is once again ripe for this Court's review.[4]

## STANDARD OF REVIEW

The Defendant has filed its motion for summary judgment under Federal Rule of Civil Procedure 56 wherein it contends that there are no factual issues for trial and that judgment may be rendered as a matter of law based upon the record.  Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A fact is "material" if it "might affect the outcome of the case."  N&O Pub. Co. v. RDU Airport Auth., 597 F.3d 570, 576 (4th Cir. 2010).  A "genuine dispute" exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

---

[4] Also following the Fourth Circuit's remand of this matter, Lee discharged his counsel. [Docs. 52; 54 at 1; 54-2 at 1].  Proceeding pro se, Lee thereafter filed numerous documents the Court deemed, collectively, to be a motion to amend his Complaint and directed NS to respond.  [Doc. 55].  Plaintiff's lengthy motion contained many of the so-called "sovereign citizen" arguments that are often seen on the internet, but have never been found to be of any merit by any court. Ultimately, the Court denied Lee's pro se motion as untimely and futile.  [Doc. 56].

A party asserting that a fact cannot be genuinely disputed must support its assertion with citations to the record. Fed. R. Civ. P. 56(c)(1). "Regardless of whether he may ultimately be responsible for proof and persuasion, the party seeking summary judgment bears an initial burden of demonstrating the absence of a genuine issue of material fact." Bouchat v. Baltimore Ravens Football Club, Inc., 346 F.3d 514, 522 (4th Cir. 2003). If this showing is made, the burden then shifts to the non-moving party who must convince the court that a triable issue exists. Id. Finally, in considering the Defendant's summary judgment motion, the Court must view the pleadings and materials presented in the light most favorable to the Plaintiff and must draw all reasonable inferences in the Plaintiff's favor as well. Adams v. UNC Wilmington, 640 F.3d 550, 556 (4th Cir. 2011).

## DISCUSSION

### I. NS's Claim-Splitting Defense.

The rule against claim splitting is one of the principles inherent in the broad doctrine of *res judicata.* Nash County Bd. of Educ. v. Biltmore Co., 640 F.2d 484, 490 (4th Cir. 1981). For the doctrine of *res judicata* to be applicable, there must be: (1) a final judgment on the merits in a prior suit; (2) an identity of the cause of action in both the earlier and the later suit; and (3) an identity of parties or their privies in the two suits. Id. at 486. The

doctrine of *res judicata* bars not only claims that were actually litigated in a prior proceeding, but also claims that could have been litigated regardless of whether they were asserted or determined in the prior proceeding. Pueschel v. United States, 369 F.3d 345, 355-56 (4th Cir. 2004) (internal citations omitted). As a corollary to the principle of *res judicata*, the "rule against claim splitting prohibits a plaintiff from prosecuting its case piecemeal and requires that all claims arising out of a single wrong be presented in one action." Lee v. Norfolk S. Ry., 802 F.3d 626, 635 (4th Cir. 2015) (internal quotation marks and citation omitted). This defense against claim-splitting, however, can be relinquished by a defendant either explicitly or implicitly.

> Express agreement between the parties that litigation of one part of a claim will not preclude a second suit on another part of the same claim is normally honored by courts. … The parties may be able to settle part of the claim only if another part is left free for later assertion. … The Restatement goes even further, recognizing an exception when the "parties have agreed in terms or in effect that the plaintiff may split his claim, or the defendant has acquiesced therein." Restatement (Second) of Judgments § 26(1)(a). Since a principal purpose of the general rule of *res judicata* is to protect the defendant from the burden of relitigating the same claim in different suits, consent, "in express words or otherwise," to the splitting of the claim prevents the defendant from invoking claim preclusion. Id. comment a.

Keith v. Aldridge, 900 F.2d 736, 740 (4th Cir. 1990) (internal quotation marks and citation omitted).

In the present matter, NS's claim-splitting defense is unavailing for two reasons. First, during discovery in the First Lawsuit, the parties agreed that the race discrimination and OSHA claims could be split. During Lee's deposition in that suit, counsel had the following exchange:

> [NS' Counsel]: Yes. We would like to withdraw [the exhibit referencing Lee's OSHA claim] at this point. And the agreement among counsel is that **whether the OSHA complaint can be gotten into in this lawsuit will be deferred** and counsel will discuss that —
>
> [Lee's Counsel]: All of us.
>
> [NS' Counsel]: Yes – with our respective clients. And if it's determined that either party wants to get into it, then arrangements will be made at a later time to allow that party to get into it. And if that happens, then it's going to be reciprocal. If one party wants to get into the OSHA issue, then the other party has the right to decide that that party wants to get into it also.

[Doc. 30-1 at 39 (depo. page 149) (emphasis added)]. While this exchange was not the pinnacle of clarity, it was a sufficient basis to support Lee's reliance in splitting his claims.

Second, the race discrimination case and the administrative OSHA claim were pending at the same time. As such, it was incumbent upon NS to raise the claim splitting defense then in order to allow for the possibility of consolidation. The Fourth Circuit has specifically prohibited a "wait and see" strategy such as NS sought to employ here. See Lee, 802 F.3d at 636 (a party with knowledge of split claim litigation must promptly raise the issue

"while both proceedings are pending") (citing <u>Rotec Indus. v. Mitsubishi Corp.</u>, 348 F.3d 1116, 1119 (9th Cir. 2003)).

For these reasons, based upon the undisputed facts before the Court, NS agreed "in terms or in effect that the plaintiff may split his claim[.]" <u>Keith</u>, 900 F.2d at 740. To conclude otherwise would encourage litigants to engage in less than forthright behavior to gain a tactical advantage. <u>Super Van Inc. v. City of San Antonio (<i>In re</i> Super Van Inc.)</u>, 92 F.3d 366, 371 (5th Cir. 1996). Therefore, NS's motion for summary judgment based upon the rule against claim-splitting is denied.

## II. Lee's Retaliation Claim under FRSA.

A railroad cannot retaliate against an employee who provides information which the employee reasonably believes constitutes a federal railroad safety violation, or who refuses to violate any federal law, rule, or regulation relating to railroad safety. 49 U.S.C. § 20109(a)(1) & (a)(2); 29 C.F.R. § 1982.102(b). The FRSA incorporates by reference the rules and procedures applicable to whistleblower cases brought pursuant to the Wendell H. Ford Aviation Investment and Reform Act for the 21st Century ("AIR–21"). <u>Lee</u>, 802 F.3d at 630 n.2; 49 U.S.C. § 20109(d)(2)(A) (any action under this section shall be governed by the rules and procedures set forth in 49 U.S.C. § 42121(b)).

To make out a *prima facie* case under the AIR–21 standard, as applied to a FRSA retaliation claim, an employee must show that: (1) he engaged in a protected activity; (2) the employer knew or suspected, actually or constructively, that the employee engaged in the protected activity; (3) the employee suffered an adverse action; and (4) the protected activity was a contributing factor in the adverse action. <u>Kuduk v. BNSF Ry. Co.</u>, 768 F.3d 786, 789 (8th Cir. 2014); 49 U.S.C. § 42121(b)(2)(B)(i); and 29 C.F.R. § 1982.104(e).  Once the employee makes such a showing, the burden shifts to the employer to demonstrate "by clear and convincing evidence, that the employer would have taken the same unfavorable personnel action in the absence of that behavior." 49 U.S.C. § 42121(b)(2)(B)(ii) & (iv).

As the Fourth Circuit noted, the AIR-21 "burden-shifting framework that is applicable to FRSA cases is much easier for a plaintiff to satisfy than the <u>McDonnell Douglas</u>[5] standard applicable to Section 1981 claims." <u>Lee</u>, 802 F.3d at 631 (citing <u>Araujo v. N.J. Transit Rail Operations, Inc.</u>, 708 F.3d 152, 159 (3d Cir. 2013)) (internal quotation omitted).  This is so because, unlike the more stringent <u>McDonnell Douglas</u> standard, Congress specifically adopted the relaxed "contributing factor" element (initially to be shown by the employee), and the more difficult "clear and convincing evidence" burden (to

---

[5] <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973).

be shouldered by the railroad as a defense thereafter), in its effort to be more protective of plaintiff-employees.  Araujo, 708 F.3d at 160-61.

## A.  Plaintiff's Burden.

### 1.  The First Three Elements of Lee's FRSA Claim.

The first and third elements of Lee's claim are easily addressed.  NS does not dispute that Lee's tagging of cars was a protected activity. See 49 U.S.C. § 20109(a)(2) (FRSA identifies the "reporting, in good faith, [of] a hazardous safety ... condition" and "refus[ing] to violate or assist in the violation of any Federal law, rule, or regulation relating to railroad safety" as protected activities).  Likewise, NS does not dispute that Lee suffered an adverse action in being suspended.  By statutory definition, a suspension constitutes an adverse action.  Id., § 20109(a).

Turning to the second element of Lee's claim, Lee must provide a forecast of evidence that would show NS knew or suspected that he engaged in the protected activity. 49 U.S.C. § 20109(a)(1)(C). As such, he must show that information about his protected activity was provided to "a person with supervisory authority over the employee or such other person who has the authority to investigate, discover, or terminate the misconduct[.]" Id.; Kuduk, 768 F.3d at 791.   Lee's forecast of evidence on this issue is, at best, thin. NS's disciplinary decision-maker over Lee was Graham P. McPherson, the

Division Manager of Mechanical Operations ("DMMO") for the Piedmont Division of NS. [Doc. 27]. McPherson testified that Lee's direct supervisors, Thomas Hatcher and Thomas Hayden, neither "reported to me that Plaintiff ha[d] raised safety issues with them," nor did Lee himself ever "contact[ ] me directly to discuss safety issues." [Id. at 8-9]. Lee, however, disputes this. During his deposition, Lee testified that he was directed to remove "bad order" tags on cars coming into the Asheville yard from Tennessee and was very "uncomfortable" in doing so. According to Lee, "So when the cars came in, I inspected them and took the tags off of them; and I sent an e-mail to Hayden and Hatcher and Cruyal, the DMMO of the central division, *and McPherson* to let them know I was instructed to do this."[6] [Doc. 30-6 at 28 (depo. Page 107) (emphasis added)]. This forecast, taken in the light most favorable to Lee, and drawing all reasonable inferences in Lee's favor as well, Adams, 640 F.3d at 556, would tend to show Lee emailed McPherson about having been directed to improperly remove "bad order" tags from cars entering the Asheville yard. While NS disputes Lee's account about what he said and what he did, Lee's forecast of evidence tends to show that NS's

---

[6] This email Lee referenced in his deposition testimony does not appear in the record before the Court.

disciplinary decision-maker had knowledge that Lee engaged in protected activity.

## 2. Contributing Factor.

This case revolves around the fourth element of Lee's FRSA claim and NS's defense. Both of these concern the same operative facts that are not in dispute. Initially, Lee has the burden to present a *prima facie* case showing that the circumstances raise an inference that his "bad ordering" of cars (the protected activity) was a contributing factor in his suspension (the adverse action). 49 U.S.C. § 42121(b)(2)(B)(i). Upon such a showing, the burden shifts to NS to show that it would have taken the same unfavorable personnel action in the absence of Lee's protected activity. Lee argues that several circumstances are present in his case which give rise to such an inference. [Doc. 31 at 14-25].

The applicable federal regulation, by way of example, identifies two instances illustrating acceptable "contributing factor" assessments:

> [T]he complainant will be considered to have met the required burden if the complaint on its face, supplemented as appropriate through interviews of the complainant, alleges the existence of facts and either direct or circumstantial evidence to meet the required showing [that the employer knew or suspected the complainant engaged in a protected activity and that activity was a contributing factor in the adverse action]. The burden may be satisfied, for example, if the complaint shows that the adverse action took place shortly after the protected activity, or at the first

opportunity available to the respondent, giving rise to the inference that it was a contributing factor in the adverse action.

29 C.F.R. § 1982.104(e)(3). As to circumstantial evidence, "indications of pretext, inconsistent application of an employer's policies, an employer's shifting explanations for its actions, antagonism or hostility toward a complainant's protected activity, the falsity of an employer's explanation for the adverse action taken, and a change in the employer's attitude toward the complainant after he or she engages in protected activity," can give rise to an inference that the protected activity was a contributing factor. Ray v. Union Pacific R.R. Co., 971 F.Supp.2d 869, 885 (S.D. Iowa. 2013) (citation omitted). The five circumstances to which Lee cites are: (1) NS's alleged inconsistent application of its company policies; (2) NS's alleged overzealous investigation of Lee; (3) the temporal proximity between Lee's protected activity and NS's adverse action; (4) NS's alleged hostility toward Lee; and (5) NS's suspension of Lee – subsequent to the suspension at issue here – as evidence of its alleged continued retaliation towards Lee.

### (a)     Inconsistent Application of NS's Policies.

Lee argues that he was treated more harshly than other employees for the same behavior. NS asserts that the suspension at issue here was for Lee having consumed beer while on duty and falsely denying it. Lee argues that other employees were not suspended for drinking on the job, hence showing

that the suspension was actually the result of some other factor, namely his protected activity. [Doc. 31 at 14-17]. The uncontroverted evidence, however, shows that NS's treatment of Lee and his coworkers was, in fact, consistent. In his argument, Lee simply conflates NS's policy regarding employee subsistence reimbursement while in "travel status" and NS's rule regarding employee alcohol consumption while "on duty."

When an employee is "on duty," NS's Rule G prohibits him from using "alcohol or other intoxicant, cannabis in any form, an amphetamine, a narcotic drug, a hallucinogenic drug, any controlled substance (as defined by federal law), or a derivative or combination of any of these[.]" [Doc. 27-1 at 5]. Lee identifies certain employees whom he contends were treated more favorably than he was because they were not suspended for drinking alcohol on the job. The uncontroverted evidence, however, was that these employees were merely in "travel status" but were not "on duty." [Doc. 27 at 8]. According to NS policy, "An employee is in travel status if the employee's duties require the employee to stay overnight away from the general area in which the employee's principal place of business or employment is located." [Doc. 30-18 at 3]. Unlike the other employees, Lee admittedly was *"on duty"* when he drank beer on June 29, 2011, and thus was subject to discipline pursuant to NS's Rule G. [Id.]. Rule G mandates that any NS employee who

uses alcohol or any of the drugs listed therein while "on duty, will be dismissed." [Doc. 27-1 at 5]. Not only was Lee *not* treated more harshly than others, he was shown exceptional lenience by being suspended and not discharged outright. For this reason, Lee's forecast of evidence on this point does not give rise to an inference that Lee's protected activity was a contributing factor in his suspension.

### (b) NS's Alleged Investigatory Zeal.

Lee next argues that the zeal with which his supervisors, Hatcher and Hayden, investigated his beer-drinking incident "is also evidence of retaliatory conduct." [Doc. 31 at 17]. The factual forecast shows that Lee returned to the Asheville yard on June 29, 2011, from an NS training session "for which he had been selected as a special presenter." [Doc. 27 at 3]. Upon Lee's return, he turned in the company truck he had been driving and submitted to Hayden receipts for reimbursement. [Doc. 30-2 at 14 (depo. Page 51)]. Hayden noticed a beer listed on Lee's meal receipt dated that same day and called Lee's supervisor, Hatcher, who was then traveling with McPherson. [Id. (depo. Page 54-55)]. Hayden called Hatcher because Lee's receipt indicated Lee had violated two company safety rules. According to Hayden, Lee had "consumed an alcoholic beverage while on company time and drove a company truck." [Id. (depo. Page 55)]. Thereafter, Hayden

contacted the manager of the Boxcar Grille, the restaurant where Lee ate that day, and confirmed that Lee drank a beer. [Id. (depo. Page 64-65)]. The manager of the Boxcar Grille reported remembering Lee because Lee requested that his beer be placed on a separate receipt from his meal. [Doc. 27 at 4]. The manager remembered that Lee was at a table alone. [Id.].

When confronted by Hatcher about the beer listed on his meal receipt, Lee falsely denied purchasing the beer. [Doc. 24-1 at 6]. Hatcher then indicated his disbelief in Lee's answer by saying something to the effect of, "Yes, you did, because the woman stated that you told her to put it on a separate ticket." [Id.]. Lee acknowledged asking for two receipts but then, according to Hatcher, falsely told Hatcher that the beer he purchased was for "a black guy in there, Cous, or something like that." [Doc. 24-1 at 6; Doc. 25 at 4].

Hatcher prepared a "charge letter" containing two alleged violations of NS policy and sent it to Lee on July 6, 2011. [Doc. 27-1 at 15]. The letter informed Lee that he was entitled to a formal investigation to determine whether he violated NS policy by drinking while on duty and then falsely denying it. [Id.]. Lee appeared for the hearing along with his union representative, D.J. Wilson. [Doc. 30-1 at 13 (depo page 44)]. According to McPherson, who conducted the hearing for NS:

At the meeting to discuss a waiver of the formal investigation (but prior to the start of the hearing), Plaintiff admitted to us, for the first time,[7] that he had consumed the beer himself. During this meeting Plaintiff did <u>not</u> allege discrimination, state that he thought drinking while on duty was acceptable behavior under Company policy or allege that he was being retaliated against for raising safety issues. He also did not argue that he was not under pay. Specifically, Plaintiff did not raise Dennis Dickerson as a comparative situation where discipline was unfairly applied. We negotiated with his Union and, instead of terminating Plaintiff for violation of Rule G, allowed him to accept a lesser discipline of a six-month suspension for the lesser offense of conduct unbecoming.

[Doc. 27 at 7 (emphasis in original)].

Lee characterizes the investigation NS undertook, while ultimately leading to his admission of dishonesty, as overzealous. [Doc. 31 at 17-18]. He contends that Hayden "went out of his way to drive out of town to the restaurant and talk to the manager to gather evidence to implicate" him. [Id.]. He argues his "NS supervisors 'railroaded' [him] for drinking a single beer with his sit-down evening meal [which] is also evidence of retaliatory conduct." [Id.]. The uncontested evidence, however, shows that NS conducted an investigation in accord with accepted procedures regarding a violation of its clearly articulated safety rules. Ironically, the thoroughness of the investigation (i.e., the driving out of town to the restaurant to speak with

---

[7] When later deposed during the pendency of the First Lawsuit, Lee admitted that his story about purchasing a beer for another person while at the Boxcar Grille restaurant was a complete fabrication. [Doc. 24-1 at 7].

the manager) proved necessary given that Lee was less than forthright about his actions at the Boxcar Grille when initially confronted. The vigor with which NS conducted this investigation is also supported by the uncontroverted evidence that Lee consumed the beer and then drove an NS vehicle. For these reasons, this forecast does not raise an inference under this circumstance that Lee's protected activity was a contributing factor in his suspension.

### (c)    Temporal Proximity.

Lee argues that the simple fact that he was suspended shortly after his "bad ordering" of cars shows a connection between these two events. According to Lee, Hayden and Hatcher had artificial "bad order" quotas and did not want carmen like Lee to bad order more than 30 cars a month.  [Doc. 30-6 at 8 (depo. page 27-28)]. Lee testified that Hayden and Hatcher and other NS supervisors ordered him to not "bad order" cars beyond that number and that they regularly removed "bad order" tags from cars that Lee had inspected.  [Id. at 9 (depo. page 29-31)].  In April, 2011, Hatcher sent Lee two emails, one day apart.  [Doc. 30-19].  The first email, sent on a Tuesday, instructed Lee that if he "bad ordered" any more cars that day, not to put them into the "system" because his (Hatcher's) "goals" were counted on Wednesdays and he (Hatcher) would enter such cars on the first shift

Wednesday. [Id. at 2]. Hatcher's email sent the following day backtracked on this instruction and directed Lee "to put all cars bad ordered into the system unless I instruct different, this way transportation will have no gripe." [Id. at 3]. Lee argues that Hatcher's emails thus raise the inference that NS had in place improper tagging quotas irrespective of rail car safety and this, in turn, raises the inference that his suspension was related to his protected activity of "bad ordering" cars beyond any such quota.

While this evidence buttresses Lee's claim that he had participated in protected activity ("bad ordering" cars), it does not tend to show that such actions were a contributing factor regarding his suspension. Hatcher's emails occurred some eleven weeks prior to Lee's suspension. In contrast, Lee's suspension came immediately on the heels of his drinking while on duty and driving an NS vehicle, which he ultimately admitted violated NS's Rule G, a terminable offense. Hatcher's emails are simply too remote in time to provide an inference that Lee's protected activity was a contributing factor in his suspension.

### (d) NS's Alleged Hostility.

Lee asserts that evidence of hostility by NS toward him shows that the suspension was a result of his protected activity. [Doc. 31 at 22-23]. For support, Lee points to his testimony during his deposition in the First Lawsuit.

22

There, Lee stated that Hayden "would get, you know, extremely mad. A very, very high-tempered person. … And if I bad ordered them, I mean, he was just -- he -- I mean, he would be irate." [Doc. 30-6 at 14 (depo. page 49-50)]. All this evidence tends to show is that Hayden is a "hot-head," not that there is a causal connection to the suspension. Hayden may well have had exaggerated negative reactions to Lee's tagging activities, but being "high-tempered" shows a tendency to have abrupt and irrational reactions. The path leading to Lee's suspension, on the other hand, was the culmination of a methodical, deliberative process. More importantly, the suspension hearing and decision were undertaken by McPherson, not Hayden. Hence, evidence of Hayden's temperament[8] shows nothing regarding the cause of McPherson's determination.

For these reasons, this forecast does not raise an inference under this circumstance that Lee's protected activity was a contributing factor in his suspension.

---

[8] While Lee testified that Hayden was emotionally volatile and regularly removed "bad order" tags from cars that Lee had inspected [Doc. 30-6 at 9 (depo. page 29-31)], noticeably absent from Lee's factual forecast is any evidence that would show Hayden removed "bad order" tags from cars that were dangerous or otherwise unfit for rail service. Hayden's anger would be understandable if he determined Lee was tagging cars that needed no repair work and, consequently, were being removed from service for no legitimate reason.

### (e)  NS's Alleged Continuation of Retaliation.

In his final argument, Lee asserts that NS retaliated against him with a second suspension[9] after he had served his six-month suspension at issue herein. He thus contends that such continued retaliation raises an inference that his protected activity was a contributing factor for the imposition of his first suspension.  [Doc. 31 at 23-25].  Lee requests the Court consider the forecast of evidence surrounding his new administrative claim regarding his 90-day suspension as it bears on his assertion that NS continues to retaliate against him.

This evidence, however, does not tend to prove anything regarding his 2011 suspension.  First, it is far too remote in time.  Second, the later suspension has no probative value without a showing of the full context of that suspension and the circumstances leading up to it. This would require a "trial within a trial" regarding a wholly separate incident. Even if the circumstances surrounding the latter suspension had some small Rule 401[10] relevance, such evidence would need to be excluded under Rule 403.[11]

---

[9] Due to an incident unrelated to Lee's claim in this action, Lee was suspended a second time for 90 days on May 22, 2013.  [Doc. 31 at 23].

[10] Rule 401 of the Federal Rules of Evidence reads, "Evidence is relevant if: (a) it has any tendency to make a fact more or less probable that it would be without the evidence; and (b) the fact is of consequence in determining the action."

[11] Rule 403 of the Federal Rules of Evidence reads, "The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of

Otherwise such evidence would confuse the issues and mislead the jury to such an extent as to substantially outweigh any potential probative value of the proffered evidence.

In addition, the later suspension is the subject of a separate administrative claim.[12]  [Doc. 31 at 24 n.42].  As such, it is a potential subject of later proceedings in this Court. Accordingly, for this Court to make the determination that Lee requests would have the effect of this Court providing an improper advisory opinion to the administrative tribunal.

In sum, a rational jury could not draw the inference that NS's alleged investigative zeal, or its alleged inconsistent application of its policies are circumstances that would tend to show that Lee's protected activity was a contributing factor in his suspension. Likewise, a rational jury could not draw the inference that the temporal proximity between Lee's protected activity and NS's suspension of him, or NS's alleged hostility toward Lee, shows that Lee's protected activity was a contributing factor in his suspension.

_____

the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."

[12] In fact, the parties agree that the Court is without jurisdiction at this time to consider any claim by Lee regarding his 90-day suspension.  Lee's 90-day suspension is currently the subject of an administrative complaint he filed on October 4, 2013. [Doc. 31 at 24 n.42].

Accordingly, Lee has failed to present a *prima facie* case of retaliation. For these reasons, NS is entitled to judgment as a matter of law.

## B. Defendant's Burden.

Even if Lee had presented a *prima facie* case, NS would still be entitled to summary judgment. Upon an employee's establishment of a *prima facie* case of retaliation, the burden shifts to the employer to demonstrate by "clear and convincing evidence that the employer would have taken the same unfavorable personnel action in the absence of [the employee's protected activity]." 49 U.S.C. § 42121(b)(2)(B)(ii) & (iv). NS contends its suspension of Lee was based upon Lee's admission of serious misconduct wholly unrelated to his "bad ordering" of cars and, therefore, NS would have imposed the same punishment notwithstanding Lee's protected activity. [Doc. 24 at 17]. In the "charge letter" it sent Lee, NS accused him of two rule violations: a "Rule G" (drinking-on-the-job) violation, and a "conduct unbecoming an employee" (dishonesty) violation. [Doc. 27-1 at 15]. Prior to the commencement of Lee's formal investigation hearing, Lee and his union representative met with McPherson and other NS personnel to discuss the possibility of a "Waiver of Investigation." This waiver process allows an employee, with NS's consent, to accept responsibility for a particular rule

violation with which he is charged, as well as *the discipline to be imposed*. [Doc. 27-1 at 13].

The uncontroverted evidence shows that during the waiver proceeding, Lee admitted to consuming beer at the Boxcar Grille while on duty, a Rule G violation. [Doc. 27 at 7]. Not only did Lee admit to the Rule G violation, he clearly knew that this transgression subjected him to termination from employment because he was an in-house instructor for NS on that very rule. [Doc. 27-1 at 8]. Lee then explicitly admitted responsibility for violating the dishonesty ("conduct unbecoming") rule. [Doc. 27-1 at 17]. Despite acknowledging that he violated these two company rules, Lee avoided outright discharge as mandated by Rule G and agreed to serve only a six month suspension. [Doc. 25 at 4-5; Doc. 27-1 at 17].

It is undisputed that during the waiver proceeding Lee never alleged discrimination, never stated that he thought drinking while on duty was acceptable behavior under NS policy, nor claimed that he was being retaliated against for raising safety issues. [Doc. 27 at 7].

In the face of this evidence, Lee simply argues that "there is substantial direct and circumstantial evidence that Lee's protected activity was a contributing factor of his suspension. Because all inferences should be construed in Lee's favor, NS has not come close to conclusively establishing

the clear and convincing evidence standard." [Doc. 31 at 26]. Lee, however, has made no attempt to rebut NS's forecast of evidence on this point. Bouchat, 346 F.3d at 522 (once the party seeking summary judgment demonstrates the absence of a genuine issue of material fact, the burden then shifts to the non-moving party who must convince the court that a triable issue exists).

NS suspended Lee for being dishonest. Lee unequivocally accepted "responsibility in connection with my conduct unbecoming an employee by acting in a dishonest manner when I claimed the cost of an alcoholic beverage as a company expense[,]" and *unequivocally accepted the six month suspension*, the "discipline imposed in this case." [Doc. 27-1 at 17]. Moreover, the alcoholic beverage Lee purchased, and about which he lied when initially confronted by NS, was the beer he later acknowledged to his employer that he drank while "on duty" and that after consuming it, he drove a company vehicle. Had Lee proceeded to the formal investigation hearing, he faced certain termination for his admitted Rule G violation. Instead, the undisputed facts disclose that Lee opted for the waiver process in order to *limit* his suspension to six months so that he could keep his job. Lee points to nothing in the record that would show NS would not have taken the same unfavorable personnel action against him in the absence of his "bad

ordering" cars.  See, e.g., Kuduk, 768 F.3d at 793 (though an affirmative

defense is often not suitable for summary judgment determination, district

court did not err in concluding defendant submitted clear and convincing

evidence that it would have discharged plaintiff whether or not he had made

unrelated reports that were activity protected by the FRSA).

As cogently explained by the Tenth Circuit:

> Whistleblower provisions are intended to promote a
> working environment in which employees are relatively free from
> the debilitating threat of employment reprisals for publicly
> asserting company violations of [protection] statutes[.] They are
> not, however, intended to be used by employees to shield
> themselves from the consequences of their own misconduct or
> failures.

Trimmer v. U.S. Dept. of Labor, 174 F.3d 1098, 1104 (10th Cir. 1999)

(internal citations and quotation marks omitted).  The uncontroverted

evidence, however, shows that Lee seeks to shield himself from discipline –

a suspension to which he agreed in order to keep his job – by using this

whistleblower statute.  The law does not support such an action.

Based upon the foregoing, the uncontroverted clear and convincing

evidence shows that NS would have taken the same unfavorable personnel

action against Lee in the absence of Lee's protected activity. Accordingly,

NS's motion for summary judgment should be granted.

## ORDER

**IT IS, THEREFORE, ORDERED** that the Defendant's Motion for Summary Judgment [Doc. 23] is hereby **GRANTED** and this action is hereby **DISMISSED** in its entirety.

**IT IS SO ORDERED**.

Signed: May 11, 2016

Martin Reidinger
United States District Judge